4-18-0438. Michelle Brooks, this is the Workers' Federal Workers' Compensation Commission. Good morning, Professor Hoot, Counsel. My name is Ivan Hootenburg, and I represent Michelle Brooks. As you know, the accident in this case was May 12, 2010, at which time Michelle Brooks was working as a police service worker. Servicing aircraft, and that job entailed carrying luggage from 40 to 70 pounds, and unloading and loading planes. But on that day, she had a back trauma to a jet aircraft. She was hit by a 700-pound door and struck from behind, causing her a head injury and cervogenic headaches, shoulder injury, and neck and mid-back injuries, for which the record shows that she had continuous complaints from May 12, 2010 to the closing of the record. She did not injure her right elbow. The record shows that in 2006, Brooks had an injury to her right elbow, and that she had surgery, and that six months later, by July 2007, all the symptoms had left, and she had returned to her regular employment without any disability treatment or care of the right elbow. Now, from the commission, as they can show, because the commission finds that she had right elbow pain related to the first accident, and unrelated to the surgery, as I said, she injured her right shoulder, and she had shoulder surgery approximately November 6, 2011. Let me try and see if I can call out the essence of what you're saying. Are you saying that her elbow problems began only after her shoulder surgery? That's absolutely correct, and that's what all the evidence shows, and the words have significance. Every record previously, they discussed the fact that she had a residual, and all of her problems simply means that it was residual. All right, so Dr. Lee's opinion supports your position, correct? Right. All right, did anybody disagree with Lee's position on that issue? Well, he said that the positioning of the claimant's arm during and after her rotator cuff surgery aggravated her ulnar nerve, causing her elbow problems. Did anybody disagree with that? Nobody said that he was wrong in that statement, per se. Okay. Their doctor, Dr. Keisler, he agrees it was a subsequent surgery, and that some people after surgery do develop a ulnar nerve problem. So he agrees, but when I asked him whether it was a shoulder surgery, he said it was some other surgery. The only problem is, he's not a treating doctor, he's an IME doctor, and in his report, the only surgeries he has listed as subsequent surgeries, and in fact, the only surgeries that exist as subsequent surgeries were for her shoulder-related or related injuries. Wasn't he asked whether it was possible that the elbow problem could have resulted from positioning? And he testified, quote, he had no opinion upon that because he did not know the position of the arm. You're correct. So, which again, would not be disagreeable. Well, he said he'd defer to Dr. Lee anyway on that issue. Correct. Now, with respect to the alleged, or the finding, the non-supported finding of her intervening in the accident on March 8th, not March 10th, 2014, every medical record required there to be news books written about headaches and pain in her neck, shoulders, between her back. And then the commission made findings contrary to the record, I actually cite to the pages of the record, where they said that she never complained after, I think they say it was late 2012, early 2013, that she never made any complaints about those parts of her body. That's unsubstantiated. I don't understand how they came to that finding, but it's refuted by the record. And as I said, not only did she make complaints, but she was treated with specific drugs for her headaches and for her pain. And then under Illinois law, which this court knows the law constituted in the Phoenix accident, if her condition was exactly the same before March 8th when she fell and had her head, and her condition was exactly the same after March 8th, that is not an intervening accident because nothing changed. And you need to change a condition in order to have an intervening injury. I'll reserve my time unless the court has some questions for me now. I don't believe we do. Thank you. You'll have five minutes on the clock. Counsel, you may respond. Good morning, Counselor Haynes. I'm a lawyer. I represent the Employer and Employee Protection Commission of the Airline Services. Obviously, I'm involved throughout my brief. It's our position that the Commission backgraded Ms. Davis. Ms. Davis has evidence to support all the conclusions that the Commission reached. What opinion do you have that supports the notion that it disagrees with Dr. Lee that the positioning of the arm after the operation was a causative factor in the condition of her? Sure. There's no actual direct opinion that we have. I think it's the totality of the evidence in this case and the way Dr. Lee's opinion in its entirety was the basis of the Commission's conclusion that his opinion was incredible. I think we have to look at several different things. His opinion was incredible? It was not incredible. Correct. First of all, as you indicated earlier, Dr. Lee basically opined that the right elbow condition was related to her post-surgical positioning and solution. That's what he said. Correct. That's what Dr. Lee said. We need to look at a couple things. He said it related to the first surgery. She actually had two surgeries. The first surgery was on November 4, 2011. Ms. Brooks actually testified to ongoing complaints in the right elbow prior to that surgery. Second, she has a pre-existing history of right elbow problems. She actually had a release on the right elbow back in 2006. Third, when Dr. Lee actually does the first EMG and TB study on the right elbow in December of 2011, so the study most contemporaneous to the time of her first surgery, it's normal. It's within normal limits. It's not until June of 2012 that he finally does another EMG study that actually now shows findings of right elbow neuropathy that he recommends treatment for. There's also an opinion from Dr. Keister, who was our examining physician, that he related these ongoing problems to the residuals from her initial surgery back in 2016. So I think we have to look at the timeline and the manifest state of the evidence in this case. It just doesn't make sense. Well, let me ask you, what about the theory, as you know, to be compensable, the injury doesn't have to be the sole cause or the primary cause of the condition of Albany. If it aggravates the pre-existing condition, recovery would still be allowed. So why couldn't this have been an aggravated surgery and these ongoing or ensuing symptoms be an aggravating factor of a pre-existing condition? Why couldn't he recover on that argument? Related to the surgery or the initial accident? Related to the surgery. His argument is, supported by Lee, correct, at least that's what Lee says, the positioning of the shoulder during the surgery gave rise to these problems. So even if it wasn't a direct cause, couldn't she recover on the grounds that the positioning during the surgery aggravated the pre-existing condition that you're talking about? Yes, you could technically. I just don't think the manifest way of the evidence in this case bears that out. But who disputes that, though? If you've got a doctor's opinion specifically saying this was a causal factor, the surgery, and nobody disagrees, how could that be against the manifest way of the evidence? Because if you have to look at all of the evidence in this case, I mean, Dr. Lee's medical opinion by itself has to make sense in light of the other evidence. And tell us why it doesn't make sense. Well, I think I just did. Because she was complaining of ongoing problems with the right elbow prior to what he says the surgery caused. He also says that it was just post-hazardous treatment. But he does an EMG study that's completely normal after the surgery. It's not until months after the fact that she finally has an EMG study that comes back to be positive. So just because Dr. Lee has provided an opinion doesn't make that opinion credible. And the commission didn't find his opinion to be credible. No, they specifically found that he was not credible. Correct. There's a specific statement. Correct, and that's my point. They found his opinion to be not credible. And for this court to reverse that decision, I just don't demand this way of dealing with it. It doesn't prove it in light of what I have. Let's look at the totality of the evidence and the experts who testified on your situation. When Dr. Kiesler was asked whether it was possible a claimant's elbow problem could have been the result of positioning or placement of a claimant's arm, he said he had no opinion about that. Correct? Correct. Then we have Dr. Kuby thought it was possible that the position of the claimant's arm during surgery could have aggravated the elbow problem. He tacitly acknowledged that it could have. And then you've got Dr. Sweeney. He did not address the possibility that the nerve problem came from the surgery. So when you say it's against the benefits of weight, they basically didn't attempt to contradict Lee in any way, did they? No. Well, because the evidence was weighted in totality. I mean, Dr. Kuby's saying it could have. I mean, the rules about it, I still think that could have is not a good. And Dr. Sweeney didn't address it one way or the other. Right. So Slee's, you could argue, I suppose, technically that Lee's opinion stood unchallenged. Nobody challenged it, correct? No, Dr. Rockley, no. Right. Okay. So what was the basis for finding it not credible? The evidence that I outlined as far as the timeline of the circumstances, her testimony about the complaints related to the right elbow prior to the surgery. And the time frame afterwards, so long thereafter? Correct. Was there anything happening between the surgery and thereafter? No. She was still treating with Dr. Lee. Well, they also called attention to the fact that the EMG NVC performed in December 2011, when she was in a sling, was normal. Correct. That was what I was pointing out. Not until June 12th that the EMG NCV showed it right on the neuropathy. And there's also the issue in this case, I'd like to address, of the intervening injury. Because she found that was related to the other condition, the sign from the acute tunnel syndrome. That she'd reached maximum medical treatment related to the neck injury and the shoulder injury as of March 27th of 2013. And that subsequently she sustained an intervening injury. Did she fall against the car? Yes. When she slipped on ice, the leaf fell, struck her head on the bumper of the car. Counsel had discussed during his arguments that there was ongoing treatment for her related to ongoing complaints specifically of headaches and neck pain. I think he reviewed the actual medical records in this case, but it's not borne out. She was going and treating. She was treating for things such as sinusitis and other problems unrelated to this accident. Yes. Do they copy her history every time she goes into the doctor that says history of chronic headaches since May of 2010? Yes. She doesn't go in with any specific complaints related to anything concerning her neck headaches or her right shoulder. So we think when you look at, yes there's treatment, but what is she really complaining about when she actually goes in and treats? She's not complaining about anything related to this work. And then all of a sudden she falls, hits her head on the bumper of the car, which the doctors have testified, the doctors, Sweeney and Dr. Van Cleef, that's a substantial injury. When you're walking along and all of a sudden you lose traction and you all basically face first into a bumper of a car, that's a substantial injury. That was then caused by the same complaints related to neck pain and headaches. So I think, again, the manifest way of the evidence in this case, when you look at everything in its entirety, supports the commission's finding that she sustained an intervening injury that severed the chain of causation between this accident, between the work accident and this intervening injury that she had, not to mention the fact that she's not even released related to all of this, that MMI by Dr. Sweeney back in March of 2007. So why is it called intervening? Because it technically severs the chain of causation. Because technically even though she was released at maximum medical improvement related to her work accident, there's nothing that prevents her from coming back and saying, oh, well, I need ongoing medical treatment related to this accident, whether that's pain management treatment, chiropractic treatment, whatever. So there are technically two distinct findings. So one, she's at maximum medical improvement, and two, even if she wasn't, she sustained an intervening injury that severed the chain of causation between her current condition and her work accident. So for these reasons, we would ask that the court affirm the findings of the commission in its entirety. Thank you. Thank you, counsel. Counsel, you may reply. Thank you, Justice. Counsel, well, first of all, I ask you, the court asked some questions. She never gave you a page of what she said she had ongoing complaints in her elbow. But they're not in the record. They're not cited in the brief in the record. They're not cited in the commission's decision. And what was cited is she said there was swelling in the elbow. That's not a complaint of pain, and that is not a sign of a neuropathy, because neuropathy creates pain and tingling down the arm. So counsel is in error, and the commission is in error. And it would be nice if the commission wants to make a finding if they actually said we're in the record. They find continuing compliance of hand, arm pain. How did she lift all the luggage all the time until she got hurt? And then, obviously, there's no complaints of pain, no finding of a recurrent neuropathy until after the shoulder surgery. And the first MRI wasn't normal. It was abnormal, but it wasn't abnormal enough, if you look at the record, to sustain a full diagnosis. So Dr. Fletcher and Dr. Lee were making that diagnosis, which was then a few months later when we could finally get another EMG to show the full diagnosis. And as Justice pointed out, during that period of time, nothing was going on. So there's no question, and I believe that the timing of the commission were against me. I'm just waiting for the evidence. We gave you actual sites in our brief to pages in the record where you can see what was going on. By the way, just privately, I'm 73 years old. I want to thank this court. I've appeared before you over the years, and I don't know if I'll get to appear before all of you again, but I want to thank you. I trust if my case lacks merit, you'll point it out. You always have. And if our case has merit, one thing I trust this court is very good facts. I want to commend you, because I'm basically in the way out, for your conscientious activities over the years. We, in the practice of the Court of Common, have been fortunate to have the guidance of this court in these matters. Thank you. Well, thank you so much, Counselor. I wish you well. Thank you. Thank you, Counsel Bolt, for your fine arguments in this matter this morning. It will be taken under advisement, and a written disposition shall issue.